# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

KATHY LANDIS, on behalf of herself and all
others similarly situated,

           Plaintiffs,

    v.

THE ELEVANCE HEALTH COMPANIES,
INC. f/k/a THE ANTHEM COMPANIES, INC.
and AMERIGROUP CORPORATION,

           Defendants.

Case No.  4:23-cv-00005-M-KS

**PLAINTIFF'S MEMORANDUM
OF LAW IN SUPPORT OF
MOTION FOR RULE 23 CLASS
CERTIFICATION**

## INTRODUCTION

Congress designed the Fair Labor Standards Act ("FLSA") to provide the minimum protection to American workers with respect to overtime and minimum wage compensation. 29 U.S.C. § 218(a). The Act specifically states that it does not preclude, and thereby encourages, states to enact their own laws that provide additional or greater advantages to their workers. *Id.* North Carolina is such a state, providing its workers with a state law cause of action for an employer's failure to pay all wages accruing on the regular payday. *See* N.C. Gen. Stat. § 95-25.6.[1]

With this motion, proposed Class Representative Landis requests that the Court certify a class of utilization reviewers in the salaried exempt Nurse Medical Management ("NMM") job title employed by Defendants The Elevance Health Companies, Inc. f/k/a The Anthem Companies, Inc. and Amerigroup Corporation (hereinafter collectively "Elevance" or "Defendants") in North

---

[1] Hybrid FLSA/Rule 23 actions under North Carolina state law regularly occur. *See Roldan v. Bland Landscaping Co., Inc.*, 341 F.R.D. 23, 32 (W.D.N.C. 2022) (rejecting as "frivolous" the argument that a Rule 23 class cannot be certified where the putative class members would also have the opportunity to opt-in to the FLSA collective); *see also Hosp. Ventures LLC*, 2021 WL 2272386, at *9 ("plaintiff has demonstrated good cause for collective action certification and class action certification").

Carolina during the relevant statutory period who seek to hold Elevance liable for failing to pay them for all hours worked over 40 per week.[2] Plaintiff further requests that the Court appoint her and her Counsel, Nichols Kaster, PLLP and Barrett Law Office, PLLC, as Class Counsel.

Plaintiff satisfies each requirement of Fed. R. Civ. P. 23. Indeed, two federal courts in related actions have already found that those in the same job position with similar claims arising from the same conduct—Defendants' misclassification of those in the NMM job title and failure to pay them for all time worked—met Rule 23's requirements. *See Midkiff v. Anthem Companies*, Inc., No. 3:22-CV-417–HEH, 2024 WL 4057579, at *1 (E.D. Va. Sept. 5, 2024) (certifying class of NMMs under the Virginia Overtime Wage Act); *Learing v. Anthem Companies, Inc*., 722 F. Supp. 3d 929, 939 (D. Minn. 2024) (certifying class of NMMs under Minnesota state wage laws).[3] Those decisions were well-reasoned and this Court should reach the same conclusion. The approximately 113 putative class members in this case all work or worked in the same position in the same state, performed similar work subject to similar policies and procedures, and were subject to the same allegedly illegal payment practices. The dispute at issue—whether Defendants failed to pay Plaintiff and all class members their accrued wages for all hours worked over 40 each week on each regular payday—rises and falls for the entire class with one determination: whether

---

[2] This Court has supplemental jurisdiction over Plaintiff's North Carolina state law claims. (*See* Defs.' Ans. to First Am. Compl. ¶ 8.)

[3] There are six cases related to this one, including: *Canaday v. The Anthem Companies*, Inc., No. 1:19-cv-01084-STA-JAY (W.D. Tenn.); *Learing, et al. v. The Anthem Companies, Inc*., No. 0:21-cv-2283 (D. Minn.); *Midkiff, et al. v. The Anthem Companies, Inc*., No. 3:22-cv-00417-HEH (E.D. Va.); *Baker, et al. v. The Anthem Companies, In*c., No. 1:21-cv-4866 (N.D. Ga.); *Lazaar, et al. v. The Anthem Companies, Inc*., No. 1:22-cv-03075-JGLC (S.D.N.Y.); K*neppar, et al. v. The Elevance Health Companies, Inc*., No. 8:23-cv-00863-MJM (D. Md.). Many of these cases involve plaintiffs who were once opt-in plaintiffs in *Canaday* who refiled their claims in other districts after the *Canaday* court limited the scope of the conditionally certified collective to only individuals who worked for Anthem within the state of Tennessee, following the Supreme Court's decision in *Bristol-Myers Squibb Co. v. Superior Court of Cal*., 137 S. Ct. 1773 (2017).

2

Defendants properly classified the job position as exempt from overtime. For these reasons and those stated further below, Landis respectfully requests the Court grant this motion.

## **PROCEDURAL HISTORY**

On January 17, 2023, Plaintiff Kathy Landis ("Plaintiff" or "Landis") filed an FLSA collective action lawsuit against Defendants on behalf of herself and all other similarly situated utilization review nurses. (ECF No. 1.) Specifically, Landis alleged that Defendants misclassified her and all other utilization review nurses with NMM job titles in North Carolina as exempt and, as a result, they are entitled to overtime premiums their overtime hours worked under the FLSA. (*Id*.) On December 20, 2023, the Court conditionally certified an FLSA collective and authorized notice. (ECF No. 39.) The FLSA notice list included approximately 114 NMMs employed by Defendants from January 17, 2020, to February 1, 2024, the date when the list was provided to Plaintiff's Counsel. (Declaration of Rachhana T. Srey ISO Motion for Class Certification ("Srey Decl.") ¶ 3.) Plaintiff's counsel distributed notice to the putative FLSA collective members on February 8, 2024, and the FLSA notice period closed on April 8, 2024. (*Id.* ¶ 4.) In addition to Landis, six other former and current NMMs joined and are currently participating in this action (referred to herein as "Opt-in" Plaintiffs).[4] (*Id.* ¶ 5.)

On March 27, 2024, Plaintiff filed a Consent Motion to File First Amended Complaint, seeking to add a claim under the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.1 *et seq*., on her individual behalf and on behalf of a putative Fed. R. Civ. P. Rule 23 class, which this Court granted on April 9, 2024. (*See* ECF Nos. 52, 58.) The First Amended Complaint was docketed on April 10, 2024. (ECF No. 59.)

---

[4] While eleven (11) individuals originally consented to join, four have since elected not to participate and have withdrawn their consents. (Srey Decl. ¶ 5.)

3

On April 18, 2024, after the FLSA notice period ended, the parties filed a joint supplemental discovery plan and the court held a telephonic nonfinal pretrial conference on April 25, 2024, to set the scope and timeline for discovery. (ECF No. 67.) On June 18, 2024, the parties reached an agreement to mediate this case, along with several related cases, and this Court stayed the litigation pending the mediation on October 23, 2024. (*See* ECF Nos. 70, 71.) The mediation was unsuccessful, and the parties resumed discovery in late October 2024. (Srey Decl. ¶ 6.) To date, the parties have engaged in both written and deposition discovery. (*Id.* ¶ 7.) Specifically, Defendants took Landis' deposition and the deposition of the following three Opt-in Plaintiffs: Tanacia Lee, Chermene Mattei, and Denise Trujillo. (*Id.*) Plaintiff's counsel deposed Erika Booth, Rene Beneby, and Jennifer Vaughn, and Anthem's Fed. R. Civ. P. 30(b)(6) corporate designees, Julie Smith, who is Elevance's Director of Compensation, and Erika Booth, who is now the Director of Healthcare Management Services.[5] (*Id.*) Discovery closes on February 25, 2025, with all potentially dispositive motions to be filed by April 25, 2025. (ECF No. 73.)

## RELEVANT FACTS

### A.    The Parties.

Defendant The Elevance Health Companies, Inc., formerly known as The Anthem Companies Inc.[6], is a multi-line health insurance company providing managed care programs and related services. (ECF No. 63, Defs.' Answer to First Am. Compl. ¶ 13.) Elevance acquired

---

[5] As a result of Defendants' continual delay in producing corporate designees, *see* ECF No. 84, Plaintiff did not depose Erika Booth in her capacity as a corporate designee until January 23, 2025. (Srey Decl. ¶ 7.) The transcript is not yet available, but Plaintiff reserves the right to cite to it in their reply in support of this motion.

[6] On or about June 28, 2022, Anthem, Inc. rebranded itself as Elevance Health, Inc. As part of this rebranding, The Anthem Companies, Inc. rebranded itself as The Elevance Health Companies, Inc. (*See* ECF No. 63, Answer to First Am. Compl. ¶ 12.)

4

Amerigroup Corporation in approximately 2012 to primarily handle its Medicaid business.[7] (ECF No. 63, Answer to First Am. Compl. ¶ 22; Ex. 31, Deposition Transcript of Corporate Designee Julie Smith ("Smith Tr.") 108:8-14.) As part of Elevance's business of administering health insurance programs, it provides its customers with utilization management services. (Ex. 31, Smith Tr. 44:4-10; Ex. 32, Deposition of Director of Healthcare Management Services Erika Booth ("Booth Tr.") 31:11-19.) Utilization or "medical necessity" review involves determining whether the healthcare provider's submitted documentation meets applicable objective medical necessity criteria. (*See* Ex. 2, NCQA Utilization Management Standards at ANTHEM_MIDKIFF_00009774 ("Medical necessity review is a process to consider whether services that are covered only when medically necessary meet criteria for medical necessity"); Ex. 33, Deposition Transcript of Manager Rene Beneby ("Beneby Tr.") 56:16-57:4; *see also* Ex. 3, Quick Reference Guide: Approval – Initial Inpatient Review at ANTHEM_LEARING_008768 (describing utilization review as "determin[ing] if the clinical meets medical necessity").)[8] One of the purposes of performing utilization review is cost containment. (Ex. 34, Deposition Transcript of Named Plaintiff and Putative Class Representative Kathy Landis ("Landis Tr.") 157:20-159:8.) Elevance employs thousands of LPNs and RNs as utilization reviewers companywide to perform the utilization management services it contracts to provide to its customers. (*See* ECF No. 29-1, Julie A. Smith Decl. ¶ 4.) Specifically, Elevance hires individuals in the following job titles to perform

---

[7] https://www.sec.gov/Archives/edgar/data/1064863/000119312512296755/d379084dex991.htm (last visited Apr. 21, 2023) (announcing WellPoint's (Anthem's predecessor) acquisition of Amerigroup on July 9, 2012. After the acquisition, Amerigroup adopted WellPoint's [Anthem's predecessor company name] job titles and the Utilization Manager RN job title was changed to "Nurse Medical Management." (*See* Ex. 4, Hiring Letter for Utilization Manager RN Position at ANTHEM_MIDKIFF_00001764).

[8] The parties agreed that some company-level documents produced in related matters may be used in this matter because they are applicable company-wide. (Srey Decl. ¶ 8.)

utilization review: Nurse Medical Management, Licensed Utilization Reviewer, Clinical Nurse Reviewer, and Nurse Reviewer. (Ex. 31, Smith Tr. 59:11-60:1).

Landis, the Opt-in Plaintiffs, and the putative Rule 23 class are or were employed by Elevance as utilization reviewers in the Nurse Medical Management ("NMM") job titles in North Carolina during the relevant statutory period.[9] (*See* ECF No. 59, First Am. Compl. ¶ 4; ECF No. 63, Defs.' Answer to First Am. Compl. ¶ 4; *see also* Ex. 5, FLSA Notice List (listing each NMM employed in North Carolina from January 17, 2020 to February 1, 2024).) Elevance classifies all NMMs company-wide, with the exclusion of those employed in California and Minnesota who were reclassified in the last year, as exempt from overtime under the FLSA and corresponding state laws.[10] (Ex. 31, Smith Tr. 140:22-141-12.)

## B. Landis and the Putative Class Share the Same Primary Job Duty.

Defendants assign NMMs to a team to process various types of insurance authorization requests submitted under a specific health insurance plan. (*See* Ex. 31, Smith Tr. 40:16-21; 44:18-21 (NMMs assigned to perform utilization review for commercial, government, or federal health plans); *see also* Ex. 6, Defs.' Ans. to Plfs.' First Set of Interrog., Req. No. 11 (listing health plans to which FLSA opt-in Plaintiffs were assigned).) All NMMs, regardless of the health plan or types of reviews they process, have the same primary job duty of processing insurance authorization requests submitted by healthcare providers, also called utilization or "medical necessity" review.

---

[9] Elevance has four levels for those in the Nurse Medical Management ("NMM") job title: NMM I, NMM II, NMM Senior, and NMM Lead. (Ex. 6, Defs.' Ans. to Plfs.' First Set of Interrog., Req. No. 1.) Plaintiff only seeks to certify a Rule 23 class consisting of NMM Is, IIs, and Seniors.

[10] Elevance's NMMs in California and Minnesota have the same job duties as the NMMs employed in other states, including North Carolina. (Ex. 31, Smith Tr. 140:2-141:12.) However, Elevance reclassified the NMMs in California from exempt to non-exempt under the FLSA and corresponding state laws in December 2023 and reclassified the NMMs in Minnesota from exempt to non-exempt in mid-2024. (Ex. 31, Smith Tr. 86:3-87:24; 90:4-92:2.)

(Ex. 32, Booth Tr. 32:12-17; Ex. 33, Beneby Tr. 21:15-22:3; *see also* Ex. 31, Smith Tr. 140:22-141:4 (admitting NMMs company-wide have the same job duties).) In line with this uniformity, Elevance has standardized company-wide job descriptions for each level of the NMM position that do not differentiate based on the health plan to which the NMM is assigned, the criteria they use, or the state in which the NMM resides. (*See* Ex. 31, Smith Tr. 52:19-53:20; Ex. 7, NMM I Job Description; Ex. 8, NMM II Job Description; Ex. 9, NMM Senior Job Description.)

## C. All Putative Class Members Follow the Same Standard Steps to Process Authorization Requests.

Elevance commonly requires utilization reviewers to follow a step-by-step utilization review process. (*See* Ex. 32, Booth Tr. 33:13-35:11 (describing steps of utilization review process); Ex. 34, Landis Tr. 58:1-5 ("utilization review process, no matter what you're doing, it's the same").) The process always begins similarly with a healthcare provider submits a request for authorization. (Ex. 32, Booth Tr. 33:18-34:1). The process always ends the same—the reviewer either approves the request if it meets the criteria or escalates it to a Medical Director if it does not meet the criteria or if it is unclear if the criteria are met. (Ex. 32, Booth Tr. 48:14-20; Ex. 33, Beneby Tr. 56:23-57:16.) Elevance, in accordance with national utilization management accreditation requirements,[11] requires NMMs to follow numerous policies and procedures governing the utilization review process. (*See* Ex. 32, Booth Tr. 49:1-17 ("we have specific, like, guidelines on how to refer to the medical director"); 84:14-19 ("there's a resource that tells them step-by-step—just as we spoke of earlier today—the process for a review"); 84:20-85:12

---

[11] Plaintiff and the putative class members are all subject to the same common uniform standards governing utilization reviews set by National Committee for Quality Assurance ("NCQA"), a national accrediting organization. (*See* Ex. 2, NCQA 2020 Utilization Management Standards and Elements; *see also* Ex. 10, Landis' 2021 Annual Performance Evaluation (requiring "100% adherence to state regulatory and NCQA accreditation authorization management requirements".).)

7

(describing documents outlining step-by-step processes governing NMMs' work); Ex. 10, Landis 2021 Annual Performance Evaluation (evaluated on "follow[ing] appropriate protocols, policies and procedures while generating authorization and/or performing medical necessity determinations."); *see also* Ex. 11, Quick Reference Guide: Approval – Concurrent Review; Ex. 12, Desktop Process - Medicaid Inpatient Review, ANTHEM_LEARING_008258 ("Purpose: To outline the process the inpatient clinician will use for reviewing inpatient days"); Ex. 13, Quick Reference Guide: Documentation – Clinical Information and Pending for Medical Director Review; Ex. 14, Quick Reference Guide: Documentation – Outpatient RN/LPN Completed DoT Tool).).

In processing requests, utilization reviewers must apply objective criteria to reach a correct determination. (Ex. 32, Booth Tr. 42:19-23; Ex. 15, Clinical Criteria for Utilization Management Decisions – Core Process at ANTHEM_BAKER_00000180 (outlining the "appropriate application of objective clinical criteria").) Which criteria or guideline to use for an authorization request depends on what is being requested and is governed by a specific hierarchy of guidelines. (Ex. 32, Booth Tr. 42:24-44:3 ("We have a hierarchy"); Ex. 33, Beneby Tr. 17:13-19 (NMMs use "the criteria hierarchy to determine what criteria set should be"); Ex. 16, Medicaid Clinical Criteria Hierarchy (chart providing "the sequence of criteria application"); Ex. 15, UM 2A – Criteria at ANTHEM_BAKER_00000180 ("Medical necessity determinations…follow a clinical criteria hierarchy").) Reviewers use a tool called PLUTO, which identifies the criteria applicable to a specific procedure code. (Ex. 32, Booth Tr. 45:4-14 ("Pluto works to a specific procedure code. So this system allows a nurse reviewer to input the specific code that is being requested. And that system will suggest what is the appropriate criteria based on the hierarchy"); Ex. 34, Landis Tr. 128:11-29 ("you put the codes into Pluto, which tells you what criteria you need to go to").) If the

clinical information submitted by the healthcare provider meets the applicable medical necessity criteria, the reviewers can approve the request. (*See* Ex. 32, Booth Tr. 48:14-20; Ex. 33, Beneby Tr. 57:5-16; Ex. 35, Deposition of Opt-in Plaintiff Denise Trujillo ("Trujillo Tr.") 22:22-23:4 ("if it does meet the criteria, then I am able to approve it, if it meets all the criteria"); Ex. 34, Landis Tr. 39:3-9 ("if they're requesting a certain test, then you go in, you find that test in the -- the criteria, and if they meet A, B, C, and D, then you can approve it").) If, however, the clinical information submitted by the provider does not meet the criteria, or if it is unclear whether it meets the criteria, then the reviewers must send the request to a Medical Director for their determination. (*See* Ex. 33, Beneby Tr. 57:19-58:1 ("Q: The process, the utilization review process, requires either [sic] of the reviewers to send that request along to the physician reviewer if criteria is not met; is that correct? A: That is correct"); Ex. 36, Deposition Transcript of Opt-in Plaintiff Chermene Mattei ("Mattei Tr.") 29:12-16 ("they have to match; otherwise, it has to go to the doctor"); Ex. 35, Trujillo Tr. 22:5-21 ("If it doesn't meet the criteria, I will send it to the medical director for further determination"); *see also* Ex. 34, Landis Tr. 57:14-20 ("if it didn't meet the criteria, there's no thinking outside the box"); Ex. 3, Quick Reference Guide: Approval –Initial Inpatient Review at ANTHEM_LEARING_008768 ("if request does not meet medical necessity, STOP and refer to: Pend to MD – Initial Inpatient Review Quick Reference Guide"); Ex. 17, Health Care Management – Utilization Management, Prohibiting the Use of Financial Incentives When Making Medical Necessity Determinations – Core Process at ANTHEM_BAKER_00115909 ("if the clinical information presented by the practitioner, provider or designee does not meet medical necessity guidelines…the request is referred to the health plan Medical Director").) Only a Medical Director, who is a licensed physician, can deny a request. (Ex. 33, Beneby Tr. 57:13-21 (utilization reviewers cannot deny a request); Ex. 18, Clinical Hierarchy for Utilization

Management Decisions ("All UM denials, based on medical necessity or clinical appropriateness, are made by licensed physicians"); Ex. 15, Clinical Criteria for Utilization Management Decisions – Core Process (a Medical Director "has the authority to deny requested services based on medical necessity review"); Ex. 19, Health Care Management – Utilization Management, Associates Performing Utilization Reviews – Core Process at ANTHEM_CANADAY_00022248 ("all inpatient and outpatient Utilization Management (UM) denials, based on medical necessity or clinical appropriateness, are made by licensed physicians").)

**D.      All Putative Class Members Acquired the Knowledge Necessary to Process Authorization Requests Through Anthem's Training.**

Landis and the putative class acquired the knowledge necessary to process requests through Elevance's robust corporate and on-the-job training, and through on-the-job experience. (*See* Ex. 35, Trujillo Tr. 49:11-20 ("Where did you first learn how to process authorization requests? A. At Anthem when I started working here"); Ex. 37, Deposition Transcript of Opt-In Plaintiff Tanacia Lee ("Lee Tr.") 39:13-18 ("I was trained on how to review the clinical against the MCG criteria, how to look up the patient's benefits, and how to go on rounds with the doctor and how to complete the process in their system"); Ex. 32, Booth Tr. 55:19-56:22 (explaining that new hire training is "not health-plan specific" and provides "a general overview training of how to review the cases"); *see also* Ex. 20, Health Care Management – Utilization Management, Utilization Management Training at ANTHEM_BAKER_00116058 ("UM associates receive orientation and comprehensive training to enhance optimal job performance"); Ex. 21, Utilization Management Operational Guideline - Orientation, Training, and Oversight for Health Care Professionals and Non-Clinical Associates at ANTHEM_MIDKIFF_00327015 (four weeks of corporate training minimum, including training on "utilization management processes and applicable accreditation standards," "system operations," "workflow," and "use of clinical review criteria").) Anthem also

10

commonly requires new utilization reviewers to practice their authorization skills by processing mock authorization requests and pairs them with a preceptor who shows them how to process requests. (Ex. 32, Booth Tr. 57:10-19.) The NMMs did not learn how to process authorization requests through their registered nursing education. (Ex. 22, Compilation of Pls.' Resp. to Defs.' Interrog. Reqs. No. 3 (stating they did not "take any courses regarding utilization review work or processing authorization requests" in nursing school); Ex. 35, Trujillo Tr. 49:11-16 ("Q. Did any of the courses you took in your registered nursing education teach you about utilization review? A. In my courses -- Q. In nursing school? A: No.") In fact, a registered nursing education is not required to perform utilization review, rather those with an LPN-level education are also able to perform the work. (*See* Ex. 31, Smith Tr. 56:25-18 (Elevance employs LPNs in the NMM job title); Ex. 33, Beneby Tr. 35:8-21 (managed team with both LPN and RN utilization reviewers); Ex. 35, Trujilo Tr. 36:23-37:11 (testifying there are LPNs on her team who process the same utilization review requests as she does); *see also* Ex. 19, Associates Performing Utilization Reviews - Core Process ("Medical Disciplines that may have the qualifications, education and/or experience to successfully perform utilization reviews as consistent with state and federal regulations and state contracts…[include] Licensed Practical Nurse/Licensed Vocational Nurse (LPN/LVN)".)

**E.      All Putative Class Members Are Subject to Common Performance Measures.**

Defendants evaluate all NMMs based on their productivity, i.e., how many reviews they conduct per day and per week. (*See, e.g.*, Ex. 31, Booth Tr. 70:15-71:4 (describing NMMs' productivity scorecards); Ex. 23, Plaintiffs' UM Productivity Scorecards (scorecard data tracking productivity for Opt-in Plaintiff Chermene Mattei); Ex. 10, Landis 2021 Annual Performance Evaluation at ANTHEM_LANDIS_000031 ("she works hard to meet her metrics of 12-15 Auths per day").) Defendants also commonly subject Plaintiff and the putative class to standardized

audits of their reviews. (Ex. 32, Booth Tr. 68:14-69:17 ("we have a corporate team that does the quality audits on a monthly basis"); *see also* Ex. 24, UM Clinical Audit Tool Reference Guide.) Audits measure whether reviewers are processing authorizations properly by following the standardized steps from start to finish. (Ex. 32, Booth Tr. 68:2-13 (Elevance performs "audits to make sure the correct criteria was applied. That the documentation supports the decision that made on the case"); Ex. 24, UM Clinical Audit Tool Reference Guide at ANTHEM_LAZAAR_00006573 (reflecting that NMMs can be penalized for the following on their audits: "criteria not utilized appropriately," "inappropriate approval," "inappropriate MD referral," "incorrect guideline utilized," "hierarchy not followed."). Finally, Defendants commonly test all putative class members on their accuracy and consistency in applying the criteria to reach the right determination through mandatory Inter-Rater Reliability ("IRR") tests. (Ex. 32, Booth Tr. 74:21-75:8 ("The IRR actually measures the right application of criteria"); Ex. 25, IRR Test Results for Opt-In Plaintiff Denise Trujillo (evaluating "correct answer" for whether to approve or refer a request); Ex. 26, Inter-Rater Reliability Assessments Policy at ANTHEM_MIDKIFF_00302256 ("no less than annually we will evaluate the consistency with which…health professionals involved in the utilization review process apply criteria in decision making").)

**F.    Defendants Uniformly Classify All Putative Class Members as Exempt, Do Not Track Their Hours Worked, and Deny Them Pay for Hours Worked over 40 Per Week.**

Defendants pay all putative class members a salary, commonly fail to track their hours worked, and uniformly classify them as exempt from the overtime requirements. (*See* Ex. 31, Smith Tr. 99:17-100:8 ("All associates in the nurse medical management jobs are paid exempt except what we talked about in Minnesota and California"); 55:12-24 (base salary for NMM job titles is the same company-wide); 128:7-21 (Elevance does not require NMMs to track their hours);

12

Ex. 32, Booth Tr. 67:5-68:1 (NMMs all classified as exempt); 75:17-25 (NMMs not required to track their hours worked); ECF No. 63, Defs.' Answer to First Am. Compl. ¶ 53 (admitting NMMs classified as exempt).) Elevance made the decision to classify all NMMs company wide as exempt some time prior to 2006. (Ex. 31, Smith Tr. 36:22-38:15; 138:11-22.) The annual salary paid to Landis, the Opt-in Plaintiffs, and all putative class members is calculated based on an assumed 40 hours of work per week. (*See* Ex. 31, Smith Tr. 88:9-21 (NMM salary based on assumed 40 hours of work per week); Ex. 32, Booth Tr. 76:1-7 (8:00 to 5:00 is "expected hours" for NMMs); *see also* Ex. 27, Kathy Landis Compensation History at ANTHEM_LANDIS_000019 (listing standard hours per week as "40.00" and listing her hourly pay rate as "$33.52"); Ex. 28, Opt-in Plaintiff Sherri Shanas' Compensation History at ANTHEM_LANDIS_002554 (listing standard hours per week as "40.00" and listing hourly pay rate as $34.61"); Ex. 29, Opt-in Plaintiff Nancy McMyers' Compensation History at ANTHEM_LANDIS_001367 (listing hourly rate as $33.89).) NMMs regularly work over 40 hours per week to try to meet their productivity expectations. (*See* Ex. 22, Compilation of Plfs' Interrog. Ans., Interrog. No. 9 (listing their typical hours worked per week).) However, because Elevance misclassified them as exempt Landis and all putative class members were paid the same set salary amount on a bi-weekly basis even when they worked over 40 hours, whereas Elevance pays hourly non-exempt employees, including the NMMs in California and Minnesota, one-and-a-half times their regular rate for all hours worked over 40 per week. (Ex. 31, Smith Tr. 109:16-110:8; Ex. 30, Hours of Work and Overtime at ANTHEM_CANADAY_0000 2357 ("if you are an overtime eligible associate, you receive overtime pay for all time worked over 40 hours within a workweek").

## **ARGUMENT**

## I. THE LEGAL FRAMEWORK FOR PLAINTIFF LANDIS' STATE LAW CLAIM FOR FAILURE TO PAY ALL ACCRUED WAGES.

Landis seeks to certify the following Rule 23 class under North Carolina state law:

> All persons who are or have been employed by Defendants in North Carolina as utilization review nurses in a Nurse Medical Management I, II, and Senior job title who are/were paid a salary and treated as exempt from overtime laws, and whose primary job is/was to perform utilization reviews at any time within the two years prior to the commencement of this action to the present.

(ECF No. 59, First Am. Compl., ¶ 68.)[12]

Plaintiff and the putative Rule 23 class seek payment for Defendants' failure to pay all accrued wages on their regular payday under the North Carolina Wage and Hour Act ("NCWHA"), N.C. Gen. Stat. § 95-25.6, commonly referred to as the payday statute. North Carolina's payday statute provides that "[e]very employer shall pay every employee all wages and tips accruing to the employee on the regular payday." N.C. Gen. Stat. § 95-25.6. The statute contains no requirement of an express contract or agreement to pay for particular work but rather applies to all time an employee has been "suffer[ed] or permit[ted] to work." *See Martinez-Hernandez v. Butterball, LLC*, 578 F. Supp. 2d 816, 821-822 (E.D.N.C. 2008) ("Were the court to interpret § 95–25.6 as requiring plaintiffs to prove that their employer expressly agreed to pay them for particular services performed…an employer would be able to avoid payment of any wages to his employees by simply claiming that the services rendered, although for the benefit of the employer, were something other than "work."). In turn, a "Wage" paid to an employee means "compensation for labor or services rendered by an employee whether determined on a time, task, piece, job, day, commission, or other basis of calculation." N.C. Gen. Stat. § 95-25.2(16). Elevance commonly contests these claims, alleging that Plaintiff and the class "have received full payment for all work

---

[12] Plaintiff is excluding those in the Nurse Medical Management Lead job title from the putative class definition.

performed" and not owed any wages for the hours they worked over 40 per week because they were properly classified as exempt from overtime under federal and state law. (*See* ECF No. 63, Defs.' Ans. to Sec. Am. Compl., Answers to ¶¶ 53-54 and Affirm. Defenses ¶ 17.)

## II. THIS COURT SHOULD CERTIFY THE STATE LAW CLAIMS.

### A. Rule 23's Certification Standards.

A major goal of class action litigation is to promote judicial economy and efficiency by "simplify[ing] litigation involving a large number of class members with similar claims." *Devlin v. Scardelletti*, 536 U.S. 1, 10 (2002); *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003). "The advantages of determining the common issues by means of a class action are evident, as all employees in the class could finalize their claims in one proceeding rather than in hundreds of individual suits." *Romero v. Mountaire Farms, Inc.*, 796 F. Supp. 2d 700, 717 (E.D.N.C. 2011). To fulfill the requirements for class certification, plaintiffs must first show compliance with Rule 23(a) of the Federal Rules of Civil Procedure, which applies to all class actions. *McLaurin v. Prestage Foods, Inc.*, 271 F.R.D. 465, 475 (E.D.N.C. 2010). Rule 23(a) provides that one or more members of a class may sue as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;
> 2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Once plaintiffs have met the requirements of Rule 23(a), they must show that class certification is proper under one of the subdivisions of Rule 23(b), which requires common questions of law or fact to predominate over any questions affecting only individual members, and that a class action to be the superior method for adjudicating the controversy.

15

*McLaurin*, 271 F.R.D. at 474; Fed. R. Civ. P. 23(b).

**B.      The Proposed Class Satisfy the Requirements of Rule 23(a).**

**1.      The Proposed Class Exceeds the Numerosity Requirement and Joinder is Impracticable.**

To be certified under Rule 23 a plaintiff must first demonstrate that its class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No specified number is needed" to make this showing, and "[a] court has broad discretion" in making a determination based on the particular circumstances of the case. *Wade v. JMJ Enterprises, LLC*, No. 1:21CV506, 2023 WL 6391683, at *3 (M.D.N.C. Sept. 30, 2023) (citations omitted). Courts in the Fourth Circuit have found as few as 25 to 30 employees sufficient to meet the numerosity requirement. *See, e.g., Calderon v. GEICO Gen. Ins. Co.*, 279 F.R.D. 337, 346 (D. Md. 2012) ("A class consisting of as few as 25 to 30 members raises the presumption that joinder would be impractical"); *Tom v. Hosp. Ventures LLC, No. 5:17-CV-98-FL,* 2021 WL 2272386, at *7 (E.D.N.C. June 3, 2021) (class exceeding 50 employees "sufficient to satisfy the numerosity requirement"); *Wade*, 2023 WL 6391683, at *4 ("The Court finds that a class of 95 members would make joinder impractical"). Here, the Rule 23 class consists of *at a minimum* 113 utilization reviewers who were employed by Elevance in North Carolina from January 17, 2021, to present in the salaried exempt Nurse Medical Management job title. Joinder is impractical and numerosity is satisfied.

**2.      The Class Shares Common Questions of Law and Fact.**

The commonality requirement of Rule 23(a)(2) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A single common question is sufficient, so long as its determination "will resolve an issue that is central to the validity of each one of the claims in one stroke." *EQT Prod. Co. v. Adair,* 764 F.3d 347, 360 (4th Cir. 2014). What matters is "the capacity

16

of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original) (quotation omitted). Commonality is evident when the plaintiff shows that "the class members have suffered the same injury," and when the injury arises from "a common contention." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). The members of a class do not need to have identical factual and legal claims. *See Myers v. Loomis Armored US, LLC*, No. 318CV00532FDWDSC, 2019 WL 3338172, at *5 (W.D.N.C. July 25, 2019) ("the commonality and typicality requirements may be satisfied even if there are factual distinctions between the claims of the named plaintiff and those of the other class members."). Rather, "[c]ommonality is usually satisfied in wage cases where the plaintiffs allege that defendants had a common policy or practice of unlawful labor practices." *Chime v. Peak Sec. Plus, Inc.*, 137 F. Supp. 3d 183, 208 (E.D.N.Y. 2015) (quotation omitted); *see also Roldan v. Bland Landscaping Co.*, Inc., 341 F.R.D. 23, 32 (W.D.N.C. 2022) (finding commonality satisfied where all of the putative class members worked in the same position and were subject to the same wage policies). Importantly, "[t]he requirement that 'class members have suffered the same injury' does not mean that each class member must be entitled to the same amount of damages." *Hosp. Ventures LLC*, 2021 WL 2272386, at *8 (rejecting argument that commonality is defeated simply because claims require "individualized determination of damages").

Here, Elevance commonly classified all NMMs employed in North Carolina as "exempt" from overtime premiums under federal and state wage and hour laws and did not pay them for all of the hours they worked over 40 per week on their regular payday, as N.C. Gen. Stat. § 95-25.6 requires. Elevance assigned proposed Class Representative Landis and all putative class members similar job titles under the similar job description. They all share the same primary job duty of processing insurance authorization requests, were all required to use objective criteria to process

17

the authorization requests, and all had the same circumscribed level of authority. Elevance uniformly evaluated them based on their productivity, required them to meet specific turn-around times, commonly audited their reviews for accuracy, and subjected them to annual testing to ensure they all accurately and consistently applied the objective criteria. Finally, Elevance commonly classified them all as exempt from overtime, failed to accurately record their hours, and failed to compensate them for all hours worked over 40 per week on their regular bi-weekly payday. As a result, common questions of law and fact exist including but not limited to:

• Whether putative class members' primary job duty of applying objective criteria to reach a correct determination according to strict policies and procedures qualifies for an exemption to overtime;

• Whether Defendants failed to compensate putative Rule 23 class members for all accrued wages on their regular payday pursuant to N.C. Gen. Stat. § 95-25.6;

• Whether, under N.C. Gen. Stat. § 95-25.22, Defendants' violations of the NCWHA were in good faith, and whether Defendants had reasonable grounds for believing its actions did not violate the statute.

For the reasons explained in detail above, the answers to these common questions are subject to common proof. Indeed, Elevance is not claiming that some NMMs employed in North Carolina were properly classified as exempt, and thus paid all of their accrued wages owed, while others were not. Rather, Elevance commonly alleges that NMMs' salary paid them for all hours worked.

Courts, including in related actions evaluating the exact same job position and company at issue here, have recognized that commonality is met where employees performing similar work allege an injury based on an employer's uniform wage policy. *See Midkiff v. Anthem Companies, Inc.,* No. 3:22-CV-417–HEH, 2024 WL 4057579, at *7 (E.D. Va. Sept. 5, 2024) (finding commonality satisfied because "the job duties of NMM Is, NMM IIs, and NMM Seniors are largely the same" and "their injuries—not receiving overtime payments—were caused by the same act, namely Defendants' uniform corporate policy classifying class members as exempt"); *Learing v.*

18

*Anthem Companies, Inc.*, 722 F. Supp. 3d 929, 939 (D. Minn. 2024) (commonality satisfied, reasoning that "[w]hether NMMs qualify as exempt is the fundamental contention in this suit, which can be resolved in one stroke"); *Roldan*, 341 F.R.D. at 32 (finding commonality satisfied where "[a]ll of the putative class members were in the same position, working under the same wage policies"); *Myer*, 2019 WL 3338172, at *5 (certifying state law claims where class members' claims arise from the same payment practices); *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, 2015 WL 1346125, at *19 (W.D.N.C. Mar. 24, 2015) (certifying class where employees commonly alleged defendant misclassified them as independent contractors); *McLaurin*, 271 F.R.D. at 476 (commonality satisfied where "plaintiffs allege that they have not been paid regular and overtime wages for all time worked as required by North Carolina's payday statute").

Commonality is met. Landis and the putative Rule 23 class members' state law payday claims rise and fall based on one determination—were they properly paid for all accrued wages on their regular payday—and they should be permitted to litigate those claims on a class-wide basis.

### 3. Landis' Claims are Typical of the Class.

A plaintiff moving for certification under Rule 23 must show that "the claims or defenses of the representative part[y] are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members, and if the plaintiff's claim is based on the same legal theory as those of the other members. *McLaurin*, 271 F.R.D. at 476 (E.D.N.C. 2010). Typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned"—some minor variation between a named plaintiff's individual claim and those of the class members she aims to represent is to be expected. *Wade*, 2023 WL 6391683, at *5.

19

Here, proposed Class Representative Landis' claim is identical to the putative class members' claims. She and the putative Rule 23 class have all suffered the same injury—failure to be paid for all hours worked on their regular payday—stemming from Elevance's uniform misclassification of utilization reviewers in the NMM job title as exempt. Further, there are no legitimate defenses to liability that would apply only to Landis and not to other class members. Landis' interests and incentives are aligned with the putative class, making her claims typical.

### 4. Class Representative Landis and Her Counsel are Adequate.

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy requires: (1) proposed class representatives must be members of the class they purport to represent and their interests must not be in conflict with those of the other class members; and (2) class counsel must be "qualified, experienced and generally able to conduct the proposed litigation." *Myers*, 2019 WL 3338172, at *5.

Here, proposed Class Representative Landis satisfies the adequacy prerequisite. She seeks the same legal relief as the class, namely compensation for all hours worked over 40 per week, liquidated damages, and attorneys' fees and costs. *See Myers*, 2019 WL 3338172, at *5 (finding typicality satisfied, reasoning "Myers has the same interests as all other ASTs: recovering the wages earned for all uncompensated work time"); *Berber v. Hutchison Tree Serv.*, No. 5:15-CV-143-D, 2018 WL 3869980, at *8 (E.D.N.C. Aug. 14, 2018) (typicality satisfied where the named plaintiff had "the same interest as the other putative class members in recovering uncompensated overtime hours"). She has participated significantly in this case, responding to written discovery, producing documents, and sitting for a deposition. (Srey Decl. ¶9.) Landis also has retained experienced legal counsel to represent her and the class. Nichols Kaster has extensive experience

20

in class action litigation and is recognized as a leader in wage and hour litigation. (*See generally* Ex. 38, Nichols Kaster Firm Resume.) They have actively and vigorously pursued the claims in this case, by, among other things, successfully moving for FLSA conditional certification, overseeing the FLSA notice process, and actively engaging in discovery. They have also successfully represented NMMs employed by Defendants in other states in six related actions, including securing a summary judgment decision on liability and liquidated damages for the NMMs employed in Minnesota and obtaining certification of the Rule 23 classes in both Minnesota and Virginia. *See Learing v. Anthem Companies, Inc*., 722 F. Supp. 3d 929, 936 (D. Minn. 2024) (appointing Nichols Kaster as Class Counsel on behalf of the Minnesota class of NMMs); *Midkiff v. Anthem Companies, Inc*., No. 3:22-CV-417–HEH, 2024 WL 4057579, at *6 (E.D. Va. Sept. 5, 2024) (certifying class of NMMs employed by Defendants in Virginia, noting Nichols Kaster is "is "experienced and capable" and appointing them as Class Counsel). Additionally, Nichols Kaster has associated with Barrett Law Offices, PLLC, a Raleigh, North Carolina law firm that is also highly experienced in class and collective litigation, particularly in wage and hour matters.  (*See* Srey Decl. ¶ 10)

### C.    The Predominance and Superiority Requirements of Rule 23(b)(3) are Satisfied.

Plaintiff must also satisfy one of the subsections of Rule 23(b), which requires that (1) questions of law or fact common to the class members predominate over individual questions; and (2) the class action is superior to available methods for the fair and efficient adjudication of the controversy. *See* Fed. R. Civ. P. 23(b).[13]

---

[13] In the Fourth Circuit, it is also necessary to demonstrate compliance with a third "implicit" requirement: the proposed class must be readily ascertainable "in reference to objective criteria." *Rehberg v. Flowers Baking Co. of Jamestown, LLC*, No. 3:12-CV-00596-MOC, 2015 WL 1346125, at *4 (W.D.N.C. Mar. 24, 2015). Plaintiff easily satisfies the ascertainability

## 1. Common Issues Predominate.

Rule 23(b)(3)'s predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "The predominance inquiry focuses not only on the existence of common questions, but also on how those questions relate to the controversy at the heart of the litigation." *EQT Prod. Co.*, 764 F.3d at 366. This inquiry further turns on whether "the defendants' common conduct is sufficient to ensure the predominance of common issues over individual ones." *Id.* at 367. Common issues of law and fact have been held to predominate "where the same evidence would resolve the question of liability for all class members." *See Berber*, 2018 WL 3869980, at *8. Generally, when a plaintiff challenges his employer's policy concerning overtime pay, "the validity of that policy predominates over individual issues and class certification is appropriate." *Id.* at *9 (finding "defendants' alleged policy of not compensating employees for overtime hours, including hours spent performing pre- and post-shift activities, predominates"); *see also Myers*, 2019 WL 3338172, at *5 ("the Court finds that the common question of whether Loomis violated section 95–25.6 by not paying ASTs all earned, promised, and/or accrued wages, including overtime pay, predominates").

Here, Elevance has uniformly treated all putative class members alike, classifying them all as exempt based on job title alone, claiming they do not have to pay them for hours over 40 per week for the same reason—an exemption from overtime—without regard to differences between

---

requirement. The class—which consists of all NMMs employed in North Carolina from January 17, 2021 to present—is clearly ascertainable from Elevance's internal employment records. *See Midkiff v. Anthem Companies, Inc.,* No. 3:22-CV-417–HEH, 2024 WL 4057579, at *6 (E.D. Va. Sept. 5, 2024) (certifying class of NMM I, IIs, and Seniors employed by Anthem in Virginia, noting "the members of Plaintiffs' proposed class are readily ascertainable because they held specific positions with Defendants during the relevant period.").

any individual class member. This claim is the center of this case, and the exemption analysis drives its resolution. Landis and all putative class members share the same primary job duty, were subject to common standards, performed their jobs in substantially similar ways, and were all classified as exempt from overtime and not paid their regular rate for hours worked over 40 per week. These commonalities will bind the class and will predominate over any individual issues.[14] *See Midkiff v. Anthem Companies, Inc.*, No. 3:22-CV-417–HEH, 2024 WL 4057579, at *8 (E.D. Va. Sept. 5, 2024) (finding that common issues predominate while rejecting Anthem's argument that "each guideline criterion must be reviewed to determine whether a nursing license was needed to interpret it and whether the NMMs used discretion.")

### 2. A Class Action is Superior.

Resolving the NCWHA payday claims as a class is "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) lists four superiority factors: (1) the class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of other pending litigation about the controversy by members of the class; (3) the desirability of concentrating the litigation in a particular forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D)).

There is no evidence here that putative class members have any interest in individually pursuing their claims. On the contrary, class members may be less apt to individually pursue claims

---

[14] It is well-established that individual damages issues do not defeat certification. *See Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 428 (4th Cir. 2003) ("[T]he necessity of making an individualized determination of damages for each class member generally does not defeat commonality."); *Berber v. Hutchison Tree Serv.*, No. 5:15-CV-143-D, 2018 WL 3869980, at *9 (E.D.N.C. Aug. 14, 2018) ("such individual questions go to damages and do not predominate over the common issues, such as whether the Hutchison defendants' failure to pay employees for pre- and post-shift activities violated N.C. Gen. Stat. § 95-25.6.").

23

for fear of reprisal and because the prospect of individual litigation is cost prohibitive. *See Berber,* 2018 WL 3869980, at *10 (class action superior in payday claim under NCWHA because "the burden and expense of individual litigation, and the legal and practical difficulty of proving individual claims concerning these events, make it unlikely that individual class members could obtain the relief sought if they were forced to proceed on their own.") Plaintiff is not aware of any other lawsuits, either individually or as a class, concerning utilization reviewers' unpaid overtime claims against Elevance other than the six related actions for NMMs employed in other states. Third, *at a minimum* a total of 113 current and former utilization reviewers in the NMM job title have worked for Elevance in North Carolina since January 17, 2021, making this forum appropriate to protect their rights. Fourth, the class will be manageable since the same policies and practices applied uniformly to members of the putative class. There are simply no manageability concerns where the central question to each class member's claim is precisely the same. *See Roldan*, 341 F.R.D. at 33 (concluding that a class action was superior to other available methods for fairly and efficiently adjudicating the controversy "because all the issues raised by Defendant's pay policies can be resolved here in a single action. Indeed, it is a considerable understatement to say that it would be inefficient to require putative class members to litigate individually"). Landis' and the putative class members' claims are most efficiently litigated in a single action.

      **D.**    **The Proposed Notice Meets Rule 23's Requirements and Should be Approved.**

      Landis' proposed class notice is attached as Exhibit 1. This notice is fair, accurate, and informative. The Court should approve the notice and require Elevance to produce a list of all class members within ten (10) days of the Court's order.

**CONCLUSION**

      Proposed Class Representative Landis respectfully requests that the Court (1) certify her North Carolina state law payday claim; (2) appoint her as Class Representative; (3) appoint

24

Nichols Kaster, PLLP and Barrett Law Offices, PLLC, as Class Counsel; (4) approve the proposed

class notice form; (5) set a 45-day notice period; (6) authorize Class Counsel to mail the Notice at

the beginning of the 45-day notice period; and (7) order Defendants to produce a list of all persons

who meet the proposed class definition.

DATED: April 29, 2025

**NICHOLS KASTER, PLLP**

/s/*Rachhana T. Srey*
Rachhana T. Srey, MN Bar No. 340133*
H. Clara Coleman, MN Bar No. 0401743*
4700 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Facsimile: (612) 338-4878
srey@nka.com
ccoleman@nka.com

**BARRETT LAW OFFICES, PLLC**

/s/*William Barrett*
Joshua M. Krasner NC Bar No. 19132
William Barrett NC Bar No. 19545
5 West Hargett St., Suite 910
Raleigh, NC 27601
Telephone: 919-999-2799
jkrasner@barrettlawoffices.com
wbarrett@barrettlawoffices.com

**Attorneys for Plaintiff, the putative FLSA Collective, and the putative Rule 23 Class**

## CERTIFICATE OF COMPLIANCE WITH RULE 7.2(f)(3)

The undersigned hereby certifies that in accordance with Local Rule 7.2(f)(3), Plaintiff's

Memorandum in Support of Motion for Rule 23 Class Certification, including headings, footnotes,

citations, and quotations, contains 7,889 words according to Microsoft Word's word count feature.

/s/*Rachhana T. Srey*
Rachhana T. Srey